**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOSEPH CROGNALE and FEGHALI FOODS, INC. PSP, Derivatively on Behalf of BOSTON SCIENTIFIC CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL F. MAHONEY, JONATHAN R. MONSON, KENNETH M. STEIN, JOSEPH M. FITZGERALD, NICHOLAS SPADEA-ANELLO, YOSHIAKI FUJIMORI, DAVID C. HABIGER, EDWARD J. LUDWIG, JESSICA L. MEGA, SUSAN E. MORANO, CHERYL PEGUS, JOHN E. SUNUNU, DAVID S. WICHMANN, and ELLEN M. ZANE, <br><br> Defendants, <br><br> –and– <br><br> BOSTON SCIENTIFIC CORPORATION, a Delaware Corporation, <br><br> Nominal Defendant. | Case No. <br><br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br><br><br><br><br><br><br><br><br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Joseph Crognale and Feghali Foods, Inc. PSP ("Plaintiffs"), by and through their undersigned attorneys, submit this Verified Stockholder Derivative Complaint for violations of the federal securities laws, breach of fiduciary duty, and unjust enrichment. Plaintiffs allege the following upon information and belief, except as to the allegations pertaining to Plaintiffs, which are based upon personal knowledge. Plaintiffs' allegations are also based on the investigation of Plaintiffs' counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases and earnings call transcripts issued by Boston Scientific Corporation ("Boston Scientific" or the "Company"), filings and

communications from the U.S. Food and Drug Administration (the "FDA"), analyst reports, news reports, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.    This is a stockholder derivative action brought by Plaintiffs on behalf of Nominal Defendant Boston Scientific against certain members of its Board of Directors (the "Board") and certain members of senior management.  The wrongdoing alleged herein subjected the Company to substantial actual and potential liability, damaged the Company's reputation, goodwill, and standing in the business and medical communities, and caused the Company to lose hundreds of millions of dollars in market capitalization.  This action seeks to remedy wrongdoing committed by the Individual Defendants (defined *infra*) from July 23, 2025, through the present (the "Relevant Period").

2.    Nominal Defendant Boston Scientific is a global developer, manufacturer, and marketer of minimally invasive medical devices used across a broad range of interventional medical specialties.  Founded in 1979, the Company develops, manufactures, and markets devices used in interventional cardiology, cardiac rhythm management, electrophysiology, endoscopy, urology, gynecology, oncology, neuromodulation, peripheral interventions, and vascular surgery. The Company conducts its operations through two reportable segments—MedSurg and Cardiovascular—while serving eight core business units: (i) Endoscopy; (ii) Urology; (iii) Neuromodulation; (iv) Interventional Cardiology and Vascular Therapies ("ICVT"); (v) Watchman; (vi) Electrophysiology; (vii) Cardiac Rhythm Management; and (viii) Interventional Oncology and Embolization.

3.    This action concerns the Individual Defendants' two interrelated and overlapping failures of candor and oversight—failures that arose from the same boardroom dynamic and the

same period of misconduct. *First*, the Individual Defendants caused the Company to issue, and themselves issued, a steady stream of materially false and misleading statements concerning the expected growth rate of Boston Scientific for fiscal year 2025—and, in particular, concerning the growth trajectory, competitive strength, and contribution to net income of the Company's U.S. electrophysiology ("U.S. EP") business.

4.     *Second*, the Individual Defendants failed to act in response to red flags demonstrating a mission-critical product-safety risk—the safety of the batteries in the Company's implantable ACCOLADE-family pacemakers—despite internal warning signs that accumulated for years.

***The U.S. EP Growth-Rate Misrepresentations***

5.     Throughout the Relevant Period, the Individual Defendants provided investors with overwhelmingly positive information concerning Boston Scientific's expected growth rate for fiscal 2025. Among other things, they repeatedly expressed confidence in the growth trajectory of the Company's U.S. EP business, touted the segment's strength against competition, emphasized the segment's contribution to the Company's overall net income projections, repeatedly issued positive statements concerning the sustainability of growth in key product segments, and continually elevated the Company's full-year guidance metrics.

6.     At the same time that the Individual Defendants disseminated these positive statements, they failed to disclose—and affirmatively concealed—material adverse facts and trends concerning the true state of the U.S. EP segment, including material adverse trends affecting procedure volumes, intensifying competitive pressures, and regulatory and reimbursement headwinds that ultimately necessitated lowered expectations. The Individual Defendants knew or recklessly disregarded that the U.S. EP segment's growth rate was unsustainable and that the segment was approaching a tipping point earlier than the market anticipated.

7.    Because of the Individual Defendants' statements of confidence and lofty expectations, investors and analysts were left surprised when the Company reported a net income miss and issued underwhelming guidance for the first half of fiscal 2026.  The corrective disclosures caused the Company's securities to decline in value, damaging the Company and exposing it to potential securities fraud liability and the costs of defending against securities class action litigation.

***The ACCOLADE Pacemaker Battery Oversight Failure***

8.    The Company's Cardiac Rhythm Management ("CRM") business unit develops and manufactures a variety of implantable devices, including implantable pacemakers that keep the hearts of pacemaker-dependent patients beating.  The safety of the batteries in those implanted devices is fundamentally mission-critical to the Company.  A battery defect in an implanted pacemaker is the paradigmatic mission-critical risk that a cardiac-device company's board is obligated to monitor.

9.    On March 19, 2026, the Company announced, and the FDA classified, a Class I recall correction—the most serious category of recall—covering more than 1.4 million ACCOLADE-family pacemakers and related devices.[1]  The recall arose from a battery defect that caused some devices to enter a "Safety Mode" that limits pacing function, posing a serious risk of injury or death to pacemaker-dependent patients.[2]  As of March 18, 2026, the Company had reported four deaths and 2,557 serious injuries associated with the defect.  On May 8, 2026, the

---

[1] U.S. Food & Drug Admin., Pacemaker Correction: Boston Scientific Issues Correction for ACCOLADE Pacemakers and CRT-Ps (Mar. 19, 2026).

[2] *See id.*

FDA issued a further urgent communication concerning the pacemaker battery failures.[3]

10.    As later reported, testing conducted at the Company's battery-manufacturing facility had consistently identified unexpected battery failures for years before the recall. Despite these persistent internal warning signs, the Company did not issue its first advisory regarding the potential need for early device replacement until December 2024. These internal battery-test failures were red flags that the Individual Defendants ignored or failed to monitor. The Individual Defendants utterly failed to implement, or, having implemented, consciously failed to monitor or oversee, a reasonable Board-level reporting and information system regarding the safety of the Company's implanted-device batteries—a failure that resulted in patient deaths, thousands of injuries, and a 1.4-million-device Class I recall.

***The Wrongdoing Is Intertwined***

11.    Both the misleading statements and the failure to appropriately oversee the Company's life-endangering products are the manifestation of the same bad-faith abdication of duty by the same fiduciaries during the same period. The very Board that was publicly projecting a durable, market-beating growth story was, contemporaneously and in the same disclosures, sitting on known, accumulating, mission-critical red flags warning about the safety of the Company's implanted-device batteries.

12.    That convergence is most starkly illustrated by the Company's April 22, 2026, first-quarter 2026 earnings release, which trumpeted growth in the Company's Cardiovascular segment while making no mention of the March 19, 2026, Class I recall correction, the four reported deaths,

---

[3] American Hospital Association, FDA issues most serious recall for certain pacemaker devices by Boston Scientific (May 8, 2026).

the 2,557 reported serious injuries, or the resulting contingent liabilities.[4]

13.     The connection between the theories is further illustrated by the Company's proxy statements, which assured stockholders that the Individual Defendants were complying with the Company's Code of Conduct and committee charters even as the Individual Defendants were breaching their fiduciary duties.[5]  The disclosure failures and the oversight failures thus flow from a common source: a Board that prioritized a growth narrative over both candor to stockholders and the safety of one of the Company's most essential, life-sustaining products.

14.     As demonstrated herein, the Individual Defendants breached their fiduciary duties by, among other things, making or causing the Company to make false and misleading statements and omissions of material fact, failing to correct such statements, and failing to act in response to red flags concerning a mission-critical product safety risk.  The Individual Defendants also caused the Company to file proxy statements that were materially false and misleading because they falsely assured investors that the Company's Code of Conduct and its committee charters were being complied with.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a)(1), Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a).

---

[4] Press Release, Boston Scientific Corp., Boston Scientific Corp. announces results for first quarter 2026 (Apr. 22, 2026).

[5] *See, e.g.*, Boston Scientific Corp., 2025 Proxy Statement (Mar. 19, 2025); Boston Scientific Corp., 2026 Proxy Statement (Mar. 18, 2026).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have

17.     This Court has personal jurisdiction over each of the Individual Defendants because each conducted business in and directed activities at this District, and because the Nominal Defendant maintains its principal executive offices in this District; each Individual Defendant has sufficient minimum contacts with this District to justify the exercise of jurisdiction over them.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Nominal Defendant maintains its principal executive offices in this District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, the Individual Defendants have conducted business in this District, and the Individual Defendants' actions have had an effect in this District.

## THE PARTIES

### Plaintiffs

19.     Plaintiff Joseph Crognale is, and has continuously been at all relevant times, a stockholder of Boston Scientific.

20.     Plaintiff Feghali Foods, Inc. PSP is, and has continuously been at all relevant times, a stockholder of Boston Scientific.

### Nominal Defendant

21.     Nominal Defendant Boston Scientific is a Delaware corporation with its principal executive offices located at 300 Boston Scientific Way, Marlborough, Massachusetts 01752.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BSX" and is a component of the S&P 500 Index.

*Officer Defendants*

22.    Defendant Michael F. Mahoney ("Mahoney") has served as the Company's Chief Executive Officer ("CEO") and as a director since 2012.  Mahoney has also served as the Company's President since October 2011 and as Chairman of the Board since May 2016.

23.    Defendant Jonathan R. Monson ("Monson") has served as the Company's Chief Financial Officer ("CFO") since June 2025.  Monson has held various roles at the Company since he joined Boston Scientific in 2008 but, immediately prior to serving as the Company's CFO, Monson served as Senior Vice President, Investor Relations.

*Director Defendants*

24.    Defendant David C. Habiger ("Habiger") has served as a Company director since July 2024.  Habiger also serves as a member of the Audit Committee and the Executive Compensation and Human Resources Committee.

25.    Defendant Edward J. Ludwig ("Ludwig") has served as a member of the Board since March 2014, and as Lead Independent Director since May 2016.  Ludwig also serves as a member of the Audit Committee and the Nominating and Governance Committee.

26.    Defendant Jessica L. Mega ("Mega") has served as a Company director since June 2023.  Mega also serves as a member of the Executive Compensation and Human Resources Committee and the Risk, Science, and Technology Committee.

27.    Defendant Susan E. Morano ("Morano") has served as a Company director since June 2023.  Morano also serves as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee.

28.    Defendant Cheryl Pegus ("Pegus") has served as a Company director since May 2024.  Pegus also serves as the Chair of the Risk, Science, and Technology Committee and as a member of the Executive Compensation and Human Resources Committee.

8

29. Defendant David S. Wichmann ("Wichmann") has served as a Company director since June 2021. Wichmann also serves as the Chair of the Audit Committee and as a member of the Risk, Science, and Technology Committee.

30. Defendant Ellen M. Zane ("Zane") has served as a member of the Board since April 2016. Zane also serves as the Chair of the Executive Compensation and Human Resources Committee and as a member of the Nominating and Governance Committee.

31. Defendant Yoshiaki Fujimori ("Fujimori") served as a member of the Board from July 2016 until April 2026. Fujimori also served as the Chair of the Risk, Science, and Technology Committee until he stepped down from the Board at the Company's 2026 Annual Meeting of Stockholders (the "2026 Annual Meeting"). Fujimori informed the Company on February 2, 2026, that he would not stand for re-election at the 2026 Annual Meeting.

32. Defendant John E. Sununu ("Sununu") served as a member of the Board from April 2009 until April 2026. Sununu served as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee until he stepped down from the Board at the 2026 Annual Meeting.

33. The defendants identified above are referred to collectively herein as the "Individual Defendants."

34. The members of the Board's Audit Committee during the Relevant Period—Wichmann (Chair), Habiger, Ludwig, Morano, and Sununu—are referred to herein as the "Audit Committee Defendants."

35. The Individual Defendants, because of their positions with Boston Scientific, possessed the power and authority to control the contents of the Company's reports to the SEC, its press releases, and its presentations to securities analysts, money and portfolio managers, and

9

institutional investors.  Each of the Individual Defendants had access to copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and/or misleading.

### *Relevant Non-Parties*

36.    Cathy R. Smith ("Smith") has served as a member of the Board since February 2026.  She also serves as a member of the Audit Committee and the Nominating and Governance Committee.

37.    Christophe P. Weber ("Weber") has served as a member of the Board since February 2026.  He also serves as a member of the Executive Compensation and Human Resources Committee and the Risk, Science and Technology Committee.

### THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

38.    Due to their positions as officers and/or directors of Boston Scientific, and because of their ability to control the business and corporate affairs of Boston Scientific, the Individual Defendants owed and continue to owe Boston Scientific and its shareholders fiduciary obligations of trust, loyalty, good faith, and candor.  They were and are required to use their utmost ability to control, manage, and oversee Boston Scientific in a fair, just, honest, and equitable manner.  They were and are obligated to act in the best interests of Boston Scientific and its shareholders, to treat all shareholders equally, and to refrain from acting in furtherance of their own personal interests.

10

39.    Because of their positions of control and authority as Boston Scientific's directors and officers, the Individual Defendants were able to, and in fact did, directly and indirectly exercise control over the wrongful acts described herein.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Boston Scientific, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders.

40.    To discharge their duties, the officers and directors of Boston Scientific were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors were required to, among other things: (i) ensure that the Company was operated in a diligent, honest, and prudent manner; (ii) maintain and implement an adequate and functioning system of internal legal, financial, compliance, quality, and management controls—including, given Boston Scientific's status as a manufacturer of life-sustaining implanted cardiac devices, Board-level reporting systems reasonably designed to provide timely notice of mission-critical risks to product safety; (iii) exercise reasonable control and supervision over the public statements made by the Company's officers and employees; and (iv) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

41.    Moreover, as officers and directors of a publicly traded company whose common stock is registered with the SEC and traded on the NYSE under the ticker symbol "BSX," the Individual Defendants owed a duty to cause the Company to report accurate, complete, and truthful information concerning Boston Scientific's financial condition, operations, products, internal controls, and business prospects—including timely and accurate disclosure of material product-safety risks, recalls, and contingent liabilities.  They also had a duty to cause the Company to

11

disclose in its SEC filings all material facts necessary for the market to value the Company's shares based on accurate information. To meet these obligations, the Individual Defendants were required to exercise reasonable oversight and supervision over Boston Scientific's management, policies, and internal controls.

42. At all relevant times, the Individual Defendants acted as agents of each other and of Boston Scientific, and, where applicable, in coordination with one another, and they were acting within the course and scope of such agency.

43. The Individual Defendants were and are also subject to specific fiduciary obligations imposed by Boston Scientific's internal policies and corporate governance procedures, and by Delaware law.

***Additional Duties Under Boston Scientific's Code of Conduct***

44. Boston Scientific maintains a written Code of Conduct (the "Code of Conduct")[6] that, by its own terms, applies to all employees, officers, and directors of the Company worldwide.[7] The Code of Conduct identifies integrity as "fundamental to Boston Scientific" and instructs each Company representative to follow both the spirit and the letter of the Code of Conduct in all Company matters.[8] The Code of Conduct expressly provides that any waiver of its provisions involving executive officers or directors may be made only by the full Board or by a Board committee of disinterested directors, and that any such waiver will be disclosed as required by

---

[6] Boston Scientific Corporation, Code of Conduct, available at https://investors.bostonscientific.com (Corporate Governance—Code of Conduct).

[7] *Id*. at 7. ("The Code applies to all employees, officers, and directors of Boston Scientific worldwide.").

[8] *Id*. at 5, 7.

law.[9]  The Code of Conduct further requires personnel, when requested, to certify that they have reviewed, understood, and agreed to follow the Code of Conduct.[10]

45.      The Code of Conduct warns that the Company takes violations of the Code of Conduct, Company policies and procedures, and applicable laws seriously, and that the consequences of violations may range from corrective action up to and including termination of employment, with potential exposure to substantial civil damages and criminal penalties (including prison terms) for violations of underlying laws or government regulations.[11]

46.      The Code of Conduct enshrines an unambiguous, Company-wide commitment to product quality and safety.  Under the heading "Be Dedicated to Quality," the Code of Conduct claims that the Company's "commitment to quality" is embodied in its quality policy: "I improve the quality of patient care and all things Boston Scientific."[12]  This statement purportedly empowers every employee, in every position, to participate in decisions and actions that could affect quality or compliance.[13]  The Code of Conduct indicates that every employee, officer, and director is expected to take responsibility for quality by, among other things: following Company policies, procedures, and work instructions every single time; taking appropriate action whenever the employee has any concern about quality; immediately reporting all potential product complaints; immediately reporting any situation that could result in a quality or regulatory issue;

---

[9] *Id.* at 7.

[10] *Id.*

[11] *Id.* at 42

[12] *Id.* at 11.

[13] *See id.*

13

and keeping quality as the employee's "#1 priority."[14]

47.    Concerning the integrity of the Company's records and public disclosure, the Code of Conduct provides that each Boston Scientific employee, officer, and director is responsible for maintaining accurate and complete business records, and that no person may falsify or improperly alter any Boston Scientific record.[15]  The Code of Conduct indicates that the Company maintains a system of procedures and accounting controls to keep its disclosures accurate and in compliance with applicable legal requirements, and it requires personnel to follow Company procedures for reporting and disclosing financial information and to cooperate with internal audit processes as requested.[16]  Read together with Section 302 of the Sarbanes-Oxley Act[17] and the rules of the SEC and the NYSE,[18] these obligations encompass the duty to ensure that the Company's periodic reports, earnings releases, and other public communications provide a full, fair, accurate, timely, and understandable disclosure of the Company's financial condition, results of operations, and material contingent liabilities—including those arising from product-safety matters such as the ACCOLADE battery defect.

48.    The Code of Conduct provides multiple resources for the confidential and, where local law permits, anonymous reporting of suspected or actual violations, including a toll-free Advice Line and an online reporting portal.[19]  The Code of Conduct expressly prohibits any form

---

[14] *See id.*

[15] *Id.* at 23.

[16] *Id.*

[17]15 U.S.C. § 7241; *see also* 17 C.F.R. § 240.13a-14.

[18]NYSE Listed Company Manual § 303A.

[19] Code of Conduct, *supra* note 6, at 39.

of retaliation against any individual arising from a good-faith report of a potential violation or integrity concern, or against any person who assists with or cooperates in an investigation.[20] The Code of Conduct further provides that complaints concerning accounting, internal accounting controls, or auditing matters will be escalated, as appropriate, to the Audit Committee of the Board.[21]

***Additional Duties of Audit Committee Members***

49.    The Boston Scientific Audit Committee Charter, effective November 18, 2025 (the "Audit Committee Charter"),[22] provides that the Audit Committee was established by the Board to assist in its oversight of, among other things, "the quality and integrity of the Company's financial reporting process, financial statements and related disclosure"; the Company's "compliance with financial, legal, and regulatory requirements"; and "the performance of the Company's internal audit function and financial controls."[23]

50.    Pursuant to the Audit Committee Charter, the Audit Committee's duties are, in relevant part, as follows:[24]

---

[20] *Id*. at 40.

[21]    *See* Boston Scientific, Compliance and Ethics, available at https://www.bostonscientific.com/en-US/corporate-responsibility/integrity/compliance-ethics.html (describing escalation of accounting, internal-accounting-control, and auditing matters to the Audit Committee of the Board of Directors).

[22] Boston Scientific Corporation, Audit Committee Charter (eff. Nov. 18, 2025), available at https://investors.bostonscientific.com (Governance—Governance Overview – Committee Charters – Audit Committee).

[23] *Id*. at 1.

[24] *Id*. at 2-6.

Financial Statements and Related Disclosure

\* \* \*

9.  The Committee shall review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," before the filing of the Company's reports on Form 10-K and Form 10-Q.  The Committee shall review management's and the independent auditor's judgment about the quality (not just acceptability) of accounting principles, the reasonableness of significant judgments, and the clarity and the completeness of the financial statements.  The Committee shall recommend to the Board whether to include the audited financial statements in the Company's annual report on Form 10-K. [25]

10.  The Committee shall have oversight responsibility for the Company's SEC Reporting Disclosure Committee (Disclosure Committee).  The Committee shall receive a report at least quarterly from the Disclosure Committee regarding the proceedings of the Disclosure Committee, including proceedings undertaken and any conclusions reached with respect to the Company's disclosure controls and procedures and internal control over financial reporting for the applicable financial statements and reports to be filed with the SEC.[26]

\* \* \*

13.  The Committee shall discuss generally and prior to public disclosure the type of information to be disclosed, and the type of presentation to be made, in earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as the type of information to be disclosed, and the type of presentation to be made, in any financial information and earnings guidance provided to analysts and rating agencies. [27]

\* \* \*

Performance of the Internal Audit Function and the Independent Auditor

\* \* \*

17.  The Committee shall review with management, the internal auditors and the independent auditor the quality, adequacy and effectiveness of the Company's internal controls, including the Company's system to monitor and manage business

---

[25] *Id*. at 4.

[26] *Id*.

[27] *Id*. at 5.

risk and financial risk exposure to the Company resulting from legal and regulatory compliance matters, and any significant deficiencies or material weaknesses in internal controls.[28]

18.  The Committee shall discuss the Company's guidelines, processes and policies to monitor, assess, evaluate and manage risk.[29]

*      *      *

Compliance with Legal and Regulatory Requirements

21.  The Committee shall assist the Board in its oversight of compliance with financial, legal, and regulatory requirements.  The Committee shall have oversight over matters of financial compliance, including financial reporting, internal controls and financial risk exposure to the Company resulting from legal and regulatory compliance matters.  [30]

*      *      *

23.  The Committee shall review with management, and any internal or external counsel as the Committee considers appropriate, any legal and regulatory matters (including the status of pending litigation) that may have a material impact on the Company and any significant reports or inquiries from regulatory or governmental agencies, and shall review with the general counsel and other designated personnel the adequacy and effectiveness of the Company's procedures to ensure compliance with its legal and regulatory responsibilities.[31]

24.  The Committee shall establish procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.[32]

51.      The Audit Committee Charter further empowers the Audit Committee, in discharging its oversight role, to investigate any matter brought to its attention with full access to

---

[28] *Id*. at 5.

[29] *Id*.

[30] *Id*. at 6.

[31] *Id*.

[32] *Id*.

all books, records, facilities, and personnel of the Company, and to retain auditors, counsel, or other experts at the Company's expense for this purpose.[33]  Those investigatory powers applied directly to the ACCOLADE battery defect, the FDA Class I recalls in February 2025, August 2025, and March 2026, the FDA's May 8, 2026 urgent communication, and the contingent product-liability exposure arising from the four reported patient deaths and 2,557 reported serious injuries described further herein.

*Additional Duties of Risk, Science, and Technology Committee Members*

52.    Recognizing the heightened oversight obligations applicable to a manufacturer of life-sustaining medical devices, the Boston Scientific Board has constituted a separate, standing Risk, Science, and Technology Committee (the "RSTC").  The Risk, Science, and Technology Committee Charter, effective November 18, 2025 (the "RSTC Charter"),[34] indicates that the RSTC was established by the Board to assist in its oversight of, among other things:

> (i) the enterprise-wide approach to risk management, (ii) regulatory compliance, (iii) the quality and safety of the Company's products, (iv) internal and external research and development and innovation initiatives and investments, and (v) the commercialization of technology.[35]

53.    The RSTC Charter expressly provides that the RSTC has primary oversight responsibility for areas of quality and non-financial compliance, while the Audit Committee retains

---

[33] *Id.* at 1.

[34] Boston Scientific Corporation, Risk, Science, and Technology Committee Charter (eff.  Nov. 18, 2025), available at https://investors.bostonscientific.com (Governance—Governance Overview – Committee Charters – Risk, Science, and Technology Committee).

[35] *Id.* at 1.

general oversight of the Company's financial compliance.[36]   The RSTC is required to meet in regular session at least four times annually.[37]

54.     The RSTC Charter imposes specific duties upon the committee including, in relevant part, as follows:

Risk Management

1.  The Committee shall assist the Board and the Audit Committee in its oversight of the Company's enterprise risk management program.

2.  The Committee shall review and discuss the Company's guidelines, processes and policies to monitor, assess, evaluate and manage non-financial risk.

3.  The Committee shall receive regular reports from the Company's management on matters relating to strategic and operational initiatives, financial performance and legal developments, which are each integrated with enterprise-risk exposures.[38]

Compliance and Quality Oversight

1.  The Committee shall assist the Board in its oversight of the Company's global compliance program, including matters related to compliance with legal and regulatory requirements as well as compliance with the Company's Code of Conduct (the 'Code').   The Committee shall periodically review and, when appropriate, recommend changes to the Code to the Board.

2.  The Committee shall have oversight over matters of non-financial compliance, and shall review, at least annually, the significant non-financial compliance matters, including significant legal or regulatory compliance risks.

3.   The Committee shall periodically review and, when appropriate, make recommendations to the Board and the Company's management regarding the adequacy and effectiveness of the Company's strategies and practices with respect to (i) compliance with laws and regulations administered by applicable federal, state, local and foreign governmental authorities, (ii) the safety and quality of the Company's products and (iii) other material aspects of its quality and compliance functions.

---

[36] *Id*. at 2.

[37] *Id*. at 1.

[38] *Id*. at 2.

4.  The Committee shall conduct periodic review of reports regarding significant compliance matters from the senior executives in charge of the Company's internal quality program and compliance functions, including (i) the Company's efforts to comply with key mandates of applicable federal, state, local and foreign governmental authorities, (ii) the results of quality and quality system assessments, (iii) at least quarterly, a report from the Company's chief compliance officer regarding the Company's Global Compliance Program, (iv) any significant product recalls, and (v) any warning letters issued by the FDA to the Company, or an equivalent statutorily defined letter from an equivalent foreign regulator.[39]

55.    The RSTC Charter therefore imposes on the RSTC's members, by the Board's own express delegation, the specific and recurring duty to receive—at least quarterly—reports concerning the results of the Company's quality and quality-system assessments, the Global Compliance Program, FDA warning letters, and any significant product recalls.  As described further herein, those reports necessarily encompassed the December 2024 ACCOLADE advisory (Recall No. 95969),[40] the February 2025 Class I designation,[41] the August 2025 recall correction (Recall No. 97467),[42] the March 19, 2026 Class I recall correction covering more than 1.6 million

---

[39] *Id*. at 2-3.

[40] U.S. Food & Drug Admin., ACCOLADE Pacemaker Devices by Boston Scientific and Potential Need for Early Device Replacement (FDA Safety Communication) (Dec. 2024); Recall No. 95969; *see also* Cardiovascular Business, FDA and Boston Scientific issue urgent alert about pacemaker failures following 2 deaths (Dec. 16, 2024).

[41] Cardiovascular Business, FDA announces Class I recall of Boston Scientific pacemakers—replacement may be necessary (Feb. 21, 2025).

[42] U.S. Food & Drug Admin., Recall No. 97467 (Aug. 2025).

implanted devices,[43] and the May 8, 2026 FDA urgent communication concerning the ACCOLADE pacemakers and the related software correction.[44]

56.    The members of the RSTC during the Relevant Period are alleged to have either failed to receive the reports required by their own Charter or, having received them, failed to act in good faith on the information disclosed therein—in either case in dereliction of the duties expressly imposed by the RSTC Charter.

## SUBSTANTIVE ALLEGATIONS

### Background

57.    Boston Scientific develops, manufactures, and markets medical devices used in a broad range of interventional medical specialties, including cardiology, electrophysiology, peripheral interventions, neuromodulation, endoscopy, and urology.  The Company's CRM business unit develops and manufactures implantable pacemakers and defibrillators, including the ACCOLADE family of pacemakers.

58.    The Company's electrophysiology business unit has in recent periods been among the Company's fastest-growing segments and a significant driver of the Company's revenue growth, margin expansion, and net-income projections.  During the Relevant Period, the Individual Defendants repeatedly identified the U.S. EP business as a key engine of the Company's expected growth for fiscal 2025.

---

[43] U.S. Food & Drug Admin., Pacemaker Correction: Boston Scientific Issues Correction for ACCOLADE Pacemakers and CRT-Ps (Mar. 19, 2026) (Class I); Katie Thomas, She Died After Her Pacemaker Battery Failed.  Its Maker Knew of Problems for Years., N.Y. Times (Mar. 19, 2026) (the "Times Investigation") (expanded recall affects 1.6 million people); *see also* MassDevice, FDA issues Class I recall correction for Boston Scientific pacemakers (Mar. 2026).

[44] American Hospital Association, FDA issues most serious recall for certain pacemaker devices by Boston Scientific (May 8, 2026).

**DEFENDANTS MATERIALLY MISLED INVESTORS CONCERNING BOSTON SCIENTIFIC'S UPDATED OUTLOOK FOR FISCAL YEAR 2025**

59.    On July 23, 2025, Boston Scientific issued a press release reporting second quarter 2025 financial results and hosted an earnings call.  The press release quoted Defendant Mahoney as follows:

> This was another excellent quarter—marked by exceptional top-line performance—that delivered margin expansion and prioritized investment for future growth.  I am incredibly grateful to our dedicated global team for demonstrating clinical and commercial excellence across the company and positioning us for differentiated long-term performance.[45]

60.    The release highlighted that management was increasing guidance for fiscal 2025 in order to incorporate updated projections for the Company, including those pertaining to the Electrophysiology ("EP") segment, stating, in relevant part:

> The company estimates net sales growth for the full year 2025, versus the prior year period, to be approximately 18 to 19 percent on a reported basis and 14 to 15 percent on an organic basis. . . . The company estimates EPS on a GAAP basis in a range of $1.89 to $1.93 and estimates adjusted EPS, excluding certain charges (credits), of $2.95 to $2.99.[46]

61.    During the related earnings call, Defendant Mahoney emphasized Boston Scientific's expectation for continued durable growth in its EP segment, stating, among other things, that "[i]n the second half of the year, we expect continued high single-digit growth led by our proprietary technologies and strategic partnerships globally." He also indicated that WATCHMAN "grew 28% in this quarter," and that "[e]lectrophysiology sales grew 94%[.]"

62.    Defendant Monson reiterated the Company's elevated guidance, stating that the Company "now expect[ed] full year 2025 reported revenue growth to be in a range of 18% to 19%

---

[45] Press Release, Boston Scientific Corp., Boston Scientific announces results for second quarter 2025 (July 23, 2025).

[46] *Id*.

versus 2024." Monson also stated: "Based on our first half margin performance, we now expect to expand full year adjusted operating margin by 75 to 100 basis points while increasing our level of investment in R&D to fuel durable, differentiated revenue growth."

63.    During the question-and-answer session, in response to an analyst's question about what the Company's EP business might look like over the next three to five years, Defendant Stein represented that the EP business would see "continued market growth in the United States," citing the safety profile and efficacy data for the Company's FARAWAVE products and the proposed Centers for Medicare and Medicaid Services rule permitting ablations in ambulatory surgical centers ("ASCs").

64.    During a later exchange, Defendant Mahoney stated that the Company "aim[ed] to be the #1 overall in EP[,]" and represented that, although the Company expected the EP market's nearly 20% growth to slow down over time, "it w[ould] still be likely mid-teens growth and the largest, fastest-growing market in med tech."

65.    On September 30, 2025, the Company held its 2025 Investor Day. During the 2025 Investor Day Call, Defendant Fitzgerald highlighted Boston Scientific's confidence in the continued growth trajectory for its EP segment, identifying EP and WATCHMAN as the Company's "highest growth markets" and stating: "So we see over the long-range plan the EP market growing at 15% and [Defendant Spadea-Anello] and [Brad Sutton, Chief Medical Officer for AF Solutions] will talk about how we're going to outpace the market."

66.    Defendant Spadea-Anello confidently touted the strength and durability of the EP segment, representing that the Company saw its Pulsed Field Ablation ("PFA") adoption "moving from 50% today globally to 80% in 2028, with Farapulse." He also claimed that Boston Scientific was "uniquely positioned to lead[.]"

23

67.     During the question-and-answer portion of the call, Defendant Spadea-Anello represented that the Company could "continue[] this growth journey into the foreseeable future[,]" noting that the Company felt "very confident that [it could] continue to do well."  He also claimed that the Company was "insulating [itself] by having an entire ecosystem tied to [its] mapping system."

68.     On October 22, 2025, Defendants issued a press release reporting third quarter 2025 results, including net sales of $5.065 billion (growing 20.3 percent on a reported basis and 15.3 percent on an organic basis), GAAP net income of $755 million ($0.51 per share), and adjusted EPS of $0.75 for the quarter.[47]

69.     Defendant Mahoney was quoted in the press release touting an "exceptional quarter of strong performance across businesses and regions[,]" and asserting that the Company was "well-positioned for differentiated growth[.]"  The release again increased the Company's full year 2025 guidance to approximately 20% net sales growth on a reported basis and GAAP EPS in a range of $1.97 to $2.01.[48]

70.     During the related earnings call, Defendant Mahoney boasted that the Company was "incredibly proud of our EP performance, with third quarter sales growing 63% as we drive continued share gains in the overall EP market."  He also represented that the Company "expect[ed] global PFA penetration to continue to expand and to exit 2025 at 50% penetration and grow to approximately 80% by 2028[.]"  In closing, Defendant Mahoney stated that he "look[ed] forward to finishing out an outstanding 2025 and delivering on [the Company's] guidance, which

---

[47] Press Release, Boston Scientific Corp., Boston Scientific announces results for third quarter 2025 (Oct. 22, 2025)

[48] *Id*.

[would] result in another year of delivering highly differentiated financial results versus our peer group."

71.     Defendant Monson provided specific financial targets, including full year 2025 reported revenue growth of approximately 20% and full year adjusted EPS of $3.02 to $3.04. Defendant also represented that, from 2026 to 2028, the Company was "targeting 10% plus average organic revenue growth[]" and "leveraged double-digit adjusted earnings per share growth[.]"

72.     On December 2, 2025, Defendant Fitzgerald participated in a question-and-answer session at the Citi Annual Global Healthcare Conference.  During a discussion of the U.S. EP segment, Defendant Fitzgerald represented that the EP business was "growing . . . probably 2x the market, driven by the ecosystem that is everything around FARAPULSE[.]"  When asked about a new U.S. market entrant, he dismissed competitive concerns as "par for the course," representing that the Company had "a very good understanding of what competition we will face and in what time frame."

73.     On January 13, 2026, Defendant Mahoney continued the positive messaging at the 44th Annual J.P.  Morgan Healthcare Conference, representing that the Company was "blessed to have . . . the 2 most differentiated products in med tech with WATCHMAN that has a 91% share and FARAPULSE[.]"  He also stated, in relevant part:

> And the OPTION data, the reimbursement has put a big tailwind behind that concomitant procedure that really only Boston Scientific can deliver uniquely and safely.  And we estimate, I think, at Investor Day, about 25% of the WATCHMAN patients are being used in a concomitant procedure.  We think that number can grow at least to 50, if not north of 50….

> So the concomitant procedure is so efficient.  It's very safe.  It's economical. Hospitals enjoy the reimbursement benefit.  We have an excellent clinical team that's very, very difficult to match to do both of those procedures.  And referring physicians are very, very comfortable with it.  So we continue to see that as a big tailwind for Boston Scientific.

74.     The above statements were materially false and/or misleading.  Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while minimizing risks from competition, seasonality, and macroeconomic fluctuations.  In truth, Boston Scientific's claims that it was continuing "to grow [its] share in the overall EP market" at "2x the market" had fallen short of reality; the Company had begun to experience new competitive entrants that were sapping its U.S. EP market share and limiting the Company's growth potential.

***The Truth Emerges with Boston Scientific's Fourth Quarter 2025 Earnings Release***

75.     On February 4, 2026, before the market opened for trading, Boston Scientific published a press release issuing 2026 guidance and announcing fourth quarter and full year 2025 results that fell shy of the Company's previously issued guidance.[49]  In pertinent part, the release reported:

> Boston Scientific . . . generated net sales of $5.286 billion during the fourth quarter of 2025, growing 15.9 percent on a reported basis . . . .  The company reported GAAP net income attributable to Boston Scientific common stockholders of $672 million or $0.45 per share (EPS), compared to $566 million or $0.38 per share a year ago [and below the company's guidance range of $0.48 to $0.52 per share], and achieved adjusted EPS of $0.80 for the period . . . .

76.     For the full year 2025, the Company reported net sales of $20.074 billion (growing 19.9 percent on a reported basis) and GAAP net income of $2.898 billion ($1.94 per share).  The press release also announced 2026 guidance—full-year reported net sales growth of approximately 10.5 to 11.5 percent and first-quarter organic growth of 8.5 to 10.0 percent—that fell below analysts' expectations.[50]

---

[49] Press Release, Boston Scientific Corp., Boston Scientific announces results for fourth quarter and full year 2025 (Feb. 4, 2026).

[50] *Id*.

77.     During the related earnings call, the Company fielded several questions concerning surprising weakness in U.S. EP performance.  In response, Defendant Mahoney conceded that the Company "planned and . . . d[id] expect to lose some share given the competitive launches that are coming out," that "with new entrants coming, it's not surprising that we lost some share[.]"  He also claimed that "the market in Q4 was closer to 18% to 20% growth rather than what some other companies have claimed at 25%."  Defendant Stein acknowledged that the Company was "3 years into the launch of FARAPULSE in the U.S." and that "the efficiency gains that people saw are largely now built into the system."

78.     The aforementioned statements stood in direct contrast to the statements Defendants had made on July 23, September 30, October 22, and December 2, 2025, and January 13, 2026, during which Defendants continually raised fiscal 2025 guidance targets, claimed heightened confidence in the U.S. EP division's growth trajectory, and minimized the risks associated with competition, seasonality, and the macro environment.

79.     Investors and analysts reacted immediately.  From a closing price of $91.62 per share on February 3, 2026, Boston Scientific's stock price fell to $75.50 per share on February 4, 2026—a decline of approximately 17.6% in the span of a single trading day equivalent to approximately a $24 billion loss in market capitalization.[51]

80.     A number of analysts who had been following Boston Scientific lowered their price targets in response to the news.  Raymond James, for example, cut its price target by more than 21% and highlighted the source of investor disappointment, observing that the "deceleration in BSX's U.S. EP franchise was steeper than we expected" and "came earlier than we had

---

[51] Boston Scientific Corporation (BSX), Yahoo! Finance, https://finance.yahoo.com/quote/BSX/ (Feb. 3–4, 2026) (single-session decline of approximately 17.6% on graph between February 3-4).

27

modeled[.]"  While noting that "4Q was optically fine," Raymond James highlighted that "both the U.S. EP and U.S. [WATCHMAN] numbers missed consensus.  These two products account for 26% of sales but contributed over half of BSX's growth in 2025.  We lowered our estimates for these products for the first time in five quarters."

81.    Barclays highlighted that the "sharp drop in the stock" was triggered by "Q4 U.S. EP sales [coming] up short of consensus," noting that "EP was up 35%, but $35 mil below consensus[]" and that management's 2026 organic sales growth and first quarter guidance came in below consensus.

82.    Evercore ISI removed BSX from its Tactical Outperform list, conceding: "We were wrong . . . we had thought that US EP revs would be fine . . . . EP missed and drove one of the single largest declines on growth slowdown fears."

83.    The fact that these analysts, and others, discussed the sudden, rapid deceleration of Boston Scientific's U.S. EP franchise alongside below-expectation performance and projections for the segment confirms that the public placed significant weight on Boston Scientific's prior revenue and growth estimates, and that Defendants' statements during the Relevant Period were material.

## THE INDIVIDUAL DEFENDANTS FAILED TO OVERSEE THE MISSION-CRITICAL RISKS ASSOCIATED WITH ACCOLADE PACEMAKER BATTERY SAFETY

84.    Boston Scientific is among the world's largest manufacturers of pacemakers by sales revenue.  The Company's implantable pacemakers and cardiac resynchronization therapy pacemakers ("CRT-Ps") perform a mission-critical, life-sustaining function: they regulate the heartbeats of pacemaker-dependent patients, many of whom would die or suffer severe cardiac compromise within minutes if their devices fail to provide effective pacing therapy.  The lithium-based battery powering each implanted pacemaker is the single component on which a pacemaker-

dependent patient most directly relies to remain alive.  The safety and reliability of those batteries is therefore central to the Company's most essential operations and to patient safety.  Under settled Delaware law, the board of directors of a corporation whose central product carries that profile owes correspondingly heightened oversight duties—at a minimum, the duty to make a good-faith effort to implement a board-level reporting and information system reasonably designed to provide timely notice of mission-critical risks to the safety of that product, and the duty to respond in good faith to red flags concerning such risks once known.

85.    For years before the recall described below, internal battery tests at the Company's battery manufacturing facility in Arden Hills, Minnesota (the "Arden Hills Facility") revealed unexpected battery failures in the ACCOLADE family of pacemakers.  According to a *New York Times* (the "*Times*") March 19, 2026 investigation (the "*Times* Investigation"),[52] which the *Times* stated was based on its review of internal Company records and government inspection documents, dozens of test batteries manufactured at the Arden Hills Facility between 2019 and 2023 failed to work properly after being subjected to conditions similar to those that had caused pacemakers to malfunction in real-world settings.[53]

86.    A separate internal Boston Scientific test conducted in 2025 identified a batch of batteries with what the *Times* Investigation described as an "extremely high failure rate."[54]  These internal battery-test failures, accumulated over more than half a decade, were red flags

---

[52] Katie Thomas, She Died After Her Pacemaker Battery Failed.  Its Maker Knew of Problems for Years., N.Y. Times (Mar. 19, 2026).

[53] *See id*.  *See also* TipRanks/The Fly, FDA inspectors found Boston Scientific pacemakers had battery issues, NYT says (Mar. 19, 2026) (summarizing the *Times* Investigation); MassDevice, Boston Scientific has reportedly had pacemaker battery problems for years (Mar. 23, 2026).

[54] *Times* Investigation; *see also* Sauder Schelkopf LLC, Boston Scientific Pacemakers Recall Investigation (Apr. 2026) (citing the *Times* Investigation).

demonstrating that the Company's implanted-device batteries were subject to a substantial risk of premature and unexpected failure.

87.    Neither the 2019-2023 internal test failures nor the "extremely high failure rate" noted in 2025 testing arose in a vacuum.  The Individual Defendants had been on notice of pacemaker battery-failure modes affecting the ACCOLADE product family—and an immediately adjacent Boston Scientific pacemaker line—for years before any of the events at issue here.

88.    Specifically, the Individual Defendants knew or recklessly disregarded, no later than 2023, that the Company's pacemaker batteries were at risk of failure.  This propensity to fail would cause four deaths, 2,557 serious injuries, and a 1.4-million-device Class I recall.

89.    The red flags known to the Board also manifested at the patient level well before any public advisory.  According to the *Times* Investigation, in or about June 2024, approximately six months before the Company issued any public communication concerning the ACCOLADE battery defect, patient Gladys Knepper, age 93, died after her Boston Scientific ACCOLADE pacemaker battery failed.[55]  According to her daughter, Ms. Knepper had, until shortly before the device failure, been sufficiently independent to do her own laundry, cook her own meals, and manage her own medications.[56]  After her pacemaker battery failed, Ms. Knepper underwent surgery to replace the failed device but died approximately three weeks later from damage to her heart sustained while the device was malfunctioning.[57]  Ms. Knepper's death was a representative

---

[55] *Times* Investigation; *see also* Amanda Pedersen, Iconic TV Show Predicts Boston Scientific's Pacemaker Battery Problem—in 1992, MD+DI (Mar. 24, 2026), https://www.mddionline.com/cardiovascular/iconic-tv-show-predicts-boston-scientific-s-pacemaker-battery-problem-in-1992).

[56] *Id*.

[57] *Id*.

pre-advisory adverse event in a category of patients most foreseeable as victims of the defect: the elderly pacemaker-dependent.  This death was precisely the type of signal that any reasonably designed medical-device-reporting and post-market-surveillance system, when integrated into the Company's quarterly reporting to the Audit Committee and the RSTC, would have escalated to Board-level attention.

90.    In December 2024, the Company issued a first public advisory regarding the ACCOLADE battery defect (Recall No.  95969), acknowledging the link between the defect and two patient deaths in ambulatory settings and attributing the issue to a battery manufacturing defect that produced elevated internal battery impedance capable of underpowering affected devices and triggering Safety Mode.[58]

91.    The Company initially represented that the issue was limited to approximately 13% of the ACCOLADE family—roughly 203,000 devices—manufactured before September 2018. As the matter progressed, the Company repeatedly expanded the affected population, first to approximately 1.3 million, then more than 1.4 million, and ultimately approximately 1.6 million implanted devices—a further series of red flags that the defect, and the Company's internal grasp of its scope, were far more material than the Individual Defendants had initially represented.[59]

92.    Even after the December 2024 advisory, the defect continued to manifest in ways that should have prompted decisive Board-level action.  According to the *Times* Investigation, in

---

[58] U.S. Food & Drug Admin., FDA Safety Communication, ACCOLADE Pacemaker Devices by Boston Scientific and Potential Need for Early Device Replacement (Dec. 2024); Recall No. 95969; *see also* MassDevice, Boston Scientific warns on potential need to replace Accolade pacemaker devices early (Dec. 16, 2024) (Company attributing the defect to a manufacturing issue producing elevated internal battery impedance capable of underpowering the device and triggering Safety Mode).

[59] MD+DI, The Hidden Cost of Silence in Medical Devices (Mar. 2026) (noting expansion of the affected population from approximately 203,000 to 1.3 million to 1.6 million devices).

or around the spring of 2025, FDA inspectors at the Arden Hills Facility discovered that a pacemaker battery manufactured *after* the Company's December 2024 advisory had also failed—a finding documented in an FDA inspection report that had not previously been made public.[60] That finding established that the Company's purported remediation following the December 2024 advisory had not stopped defective batteries from continuing to come off the production line. The Company's own Global Chief Medical Officer, Defendant Stein, publicly described the matter as a complicated problem that required sustained and diligent internal investigation[61]—tacitly acknowledging that the defect was the subject of sustained internal investigation over an extended period. Nevertheless, that investigation does not appear to have generated any Board-level reports, escalations, or remediation.

93. In its public response to the *Times* Investigation, Boston Scientific said it disagreed with the *Times*' "positioning" of the matter. The Company did not, however, refute any of the specific factual findings reported.[62]

94. On March 18, 2026, the Company reported that the ACCOLADE battery defect was associated with four patient deaths and 2,557 reported serious injuries.[63]

---

[60] *Times* Investigation; *see also* Bloomberg Law, Boston Scientific Drops After Report of Pacemaker Battery Issues (Mar. 19, 2026).

[61] *Times* Investigation, (reporting statements attributed to the Company's Chief Medical Officer describing the matter as a complicated problem requiring sustained internal investigation).

[62] MassDevice, FDA issues Class I recall correction for Boston Scientific pacemakers, (quoting Boston Scientific statement that it "disagrees with the overall positioning of the article"; the Company did not, on the public record, refute the specific factual findings reported).

[63] U.S. Food & Drug Admin., Pacemaker Correction: Boston Scientific Issues Correction for ACCOLADE Pacemakers and CRT-Ps (May 7, 2026)

95.     On March 19, 2026, the Company transmitted an Urgent Medical Device Correction letter expanding the recall to cover 27 device models across the ACCOLADE, Proponent, Essentio, Altrua 2, Visionist, and Valitude product families, and the FDA simultaneously classified the recall correction as Class I—the most serious category of recall—covering more than 1.4 million implanted devices.[64] The battery defect can reportedly cause affected devices to enter "Safety Mode," a state of limited functionality in which the pacemaker may be unable to properly regulate the patient's heart rhythm and rate, posing a serious risk of injury or death to pacemaker-dependent patients.  The Company disclosed that certain affected devices carry a 7.6% risk of early device replacement and may not achieve projected longevity.[65] The Company further disclosed that the failure mode can occur without warning, particularly during higher-power device functions such as remote monitoring or data transmission—meaning that pacemaker-dependent patients may receive no advance notice before their device enters Safety Mode.[66]

96.     On May 8, 2026, the FDA issued a further urgent communication concerning the ACCOLADE pacemaker battery failures and the related Brady SMR6 software correction; a final software mitigation is expected later in 2026.[67]

---

[64] *Id*.

[65] Boston Scientific Corp., Urgent Medical Device Correction (Mar. 19, 2026); *see also* MassDevice, *supra* note 43 (reporting 7.6% risk of early device replacement for newly added devices).

[66] FDA Safety Communication, *supra*; FDA Pacemaker Correction, *supra* (failure mode can occur without warning, particularly during higher-power operations such as remote monitoring or data transmission).

[67] American Hospital Association, *supra* (May 8, 2026); FDA Pacemaker Correction, *supra* (Brady SMR6 software/firmware update).

97.     The Individual Defendants' oversight failure was compounded by the failure of the Company's disclosure control.  On April 22, 2026—approximately one month after the expanded Class I recall and the publication of the *Times* Investigation, and approximately two weeks before the May 8, 2026 FDA urgent communication—the Company issued its first quarter 2026 earnings release, reporting net sales of $5.203 billion, 13.5% reported Cardiovascular-segment revenue growth, and adjusted EPS of $0.80.[68]  On the public face of that release, the Company did not describe the March 19, 2026 Class I recall correction, the *Times* Investigation, the four patient deaths, the 2,557 reported serious injuries, the FDA inspection findings concerning the post-advisory battery failure at the Arden Hills Facility, or the contingent product liability and governmental investigation exposure flowing from the foregoing, and disclosed no litigation-related accrual or charge in connection with the defect.[69]  Nine days after the expanded Class I recall, on March 28, 2026, the Company instead issued a press release announcing positive CHAMPION-AF clinical-trial results for the unrelated WATCHMAN FLX device, without addressing the ACCOLADE matter.[70]

98.     The Individual Defendants were supine in the face of mounting red flags, including: (i) years of internal battery test failures at the Arden Hills Facility; (ii) multiple prior recalls on the same and adjacent pacemaker product lines for the same and related battery-failure modes; (iii)

---

[68] Boston Scientific Corp., Press Release, Boston Scientific Announces Results for First Quarter 2026 (Apr. 22, 2026) (Form 8-K), https://www.sec.gov/Archives/edgar/data/0000885725/000088 572526000031/q12026earningsrelease.htm (net sales of $5.203 billion; Cardiovascular segment growth of 13.5% reported; adjusted EPS of $0.80).

[69] *Id*.  (the release contains no apparent reference to the ACCOLADE Battery Defect, the March 19, 2026 Class I recall correction, the *Times* Investigation, or any related litigation accrual or charge).

[70] Boston Scientific Corp., Press Release, CHAMPION-AF Study of the WATCHMAN FLX™ Left Atrial Appendage Closure Device (Mar. 28, 2026).

the named pre-advisory death of Gladys Knepper and other comparable adverse events; (iv) a serially expanding population of affected devices; (v) a spring 2025 FDA inspection finding of continuing battery failures; and (vi) an internal 2025 test reflecting an "extremely high failure rate" in the Company's pacemaker batteries. This sustained failure to address the mission-critical risks associated with implanted device battery safety resulted in four patient deaths, 2,557 reported serious injuries, and a 1.4-million-device Class I recall (subsequently expanded to approximately 1.6 million implanted devices). In addition, the oversight failure has exposed the Company to: (i) potential product liability litigation;[71] (ii) regulatory exposure, including parallel governmental investigations that may follow the March 2026 disclosures; (iii) reputational harm in the CRM market in which Boston Scientific competes against Medtronic and Abbott; and (iv) significant costs of remediation, investigation, and defense—all of which would have been substantially mitigated, or avoided altogether, had the Individual Defendants discharged their oversight duties in good faith.

## THE FALSE AND MISLEADING PROXY STATEMENTS

99.    Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 thereunder, 17 C.F.R. § 240.14a-9, prohibit soliciting a proxy by means of a communication that, at the time and in light of the circumstances, is false or misleading with respect to any material fact, or that omits any material fact necessary to make the statements made not false or misleading.

---

[71] As of the filing of this Complaint, multiple plaintiffs' firms have publicly announced product-liability investigations on behalf of patients implanted with ACCOLADE-family pacemakers and CRT-Ps. *See, e.g.*, Sauder Schelkopf LLC, Boston Scientific Pacemakers Recall Investigation (Apr. 2026).

100.    Here, each proxy issued during the Relevant Period solicited stockholder votes on, among other things, the election of directors.  The re-election of the allegedly culpable directors—and approval of compensation tied to the allegedly misstated results—supply the "essential link" required by the law.  The Company filed a Proxy Statement on Schedule 14A on March 19, 2025 (the "2025 Proxy"), after the December 2024 ACCOLADE advisory and the February 2025 Class I recall).  On March 18, 2026—the day before the March 19, 2026, Class I recall correction and the related *Times* Investigation—the Company filed another Proxy Statement (the "2026 Proxy" and, together with the 2025 Proxy, the "Proxies").

***Omission of the ACCOLADE Battery Defect and Recall Entirely***

101.    Neither of the Proxies contains any reference to the ACCOLADE pacemaker, the battery defect, "Safety Mode," the FDA recalls, or the associated deaths and injuries—even while both affirmatively describe the Board's and committees' oversight of "product quality and safety." Under Rule 14a-9(a), an omission of a material fact necessary to make affirmative statements not misleading is itself a violation.  Having elected to tout the Company's commitment to product safety and quality oversight, the Company was obliged not to omit the most significant then-existing product safety matter—a mission-critical, life-sustaining device defect that had already produced a December 2024 advisory and a February 2025 Class I recall (as of the filing of the 2025 Proxy), and four deaths, 2,557 serious injuries, and a 1.4-million-device Class I recall correction (as of the filing of the 2026 Proxy).[72]

***Risk, Science and Technology Committee—Product Quality and Safety Oversight***

102.    Both Proxies represent that the RSTC provides Board-level oversight of "product quality and safety"; reviews, at least annually, "product-related regulatory actions" and "the safety

---

[72] *See* 2025 Proxy at 24-25, 34; 2026 Proxy at 27-28, 37.

and quality of our products"; and reviews "quality and quality system assessments and reports regarding the Company's global compliance program."

103.    These statements imply a functioning, charter-compliant safety oversight system. This complaint alleges the opposite: years of internal battery-test failures at the Arden Hills Facility, prior recalls on the same failure mode, a pre-advisory patient death, a serially expanding affected population, and a post-advisory FDA inspection finding—none of which generated the Board-level escalation the RSTC Charter required.   The representations in the Proxies were therefore materially misleading when made, and incomplete absent disclosure of the recall.[73]

***Board Enterprise Risk Oversight Representations***

104.    The 2026 Proxy states the Board "oversees an enterprise-wide approach to risk management," "receives regular updates from management regarding the Company's key risks and mitigation actions," and emphasizes "understanding the most significant risks facing the Company."[74]    The 2025 Proxy contains a materially identical description of the Board's responsibility for oversight of enterprise risk.[75]   A reasonable stockholder would understand these statements to represent that the Board was in fact monitoring the Company's most significant risks. Here, Plaintiffs allege that the Board failed to monitor, or consciously disregarded, the mission-critical battery-safety risk—the paradigmatic "most significant risk" for a pacemaker manufacturer—rendering these representations misleading and the omission of the recall material.

---

[73] *See* 2025 Proxy at 24, 34; 2026 Proxy at 37.  *See also* "*Additional Duties of Risk, Science, and Technology Committee Members*."

[74] *See* 2026 Proxy at 27-28.

[75] *See* 2025 Proxy at 24-25.

*Audit Committee—Integrity of Financial Reporting and Disclosure Controls*

105.    The 2026 Proxy represents that the Audit Committee assists the Board in overseeing "the quality and integrity" of the Company's financial reporting, "related disclosures and disclosure controls and procedures," and compliance with legal and regulatory requirements.[76] The 2025 Proxy contains substantially similar representations.[77]    As alleged herein, however, during the Relevant Period, the Company issued materially false and misleading statements about U.S. EP growth and fiscal 2025 guidance, as shown by the April 22, 2026, first-quarter release that touted Cardiovascular growth while omitting the recall, deaths, injuries, and contingent liabilities. The representations that the Audit Committee was overseeing the Company's disclosure controls and the integrity of Boston Scientific's financial reporting integrity are misleading in light of these allegations.

*Code of Conduct Compliance Representations*

106.    Both Proxies represent that the Company maintains a Board-approved Code of Conduct "to ensure our directors, employees and officers, including our Chief Executive Officer and Chief Financial Officer, understand the basic principles that govern our corporate conduct," and that any waivers will be disclosed.[78] As alleged herein, the Code of Conduct mandates, among other things, prompt reporting of quality and regulatory issues, accurate public disclosure, and that quality be the "number-one priority."    Plaintiffs alleges, however, that the Individual Defendants did not comply with these mandates—both as to the battery defect and as to the U.S. EP growth/earnings statements—so the implicit representation of compliance was materially false or

---

[76] *See* 2026 Proxy at 33.

[77] *See* 2025 Proxy at 30.

[78] *See* 2025 Proxy at 27; 2026 Proxy at 30.  *See also* Code of Conduct, *supra.* at 12-13.

misleading.

***"Robust Quality System" Representation in the Compensation Discussion***

107.    In the executive compensation discussion, both Proxies describe a "Quality (Modifier)" that "[a]llows the Board to reduce annual bonus funding for failure to meet quality objectives, reinforcing accountability across the Company, while our robust quality system supports our category leadership strategy."  This was misleading because the phrase "robust quality system" is directly contradicted by Plaintiffs' allegations of a years'-long, undisclosed battery quality failure.[79]  Moreover, the 2025 Proxy discloses that the annual bonus was funded at 150% of target based on the Company's "outstanding financial results in 2024"—i.e., the quality modifier did not reduce funding—notwithstanding the December 2024 advisory and the February 2025 Class I recall, undercutting the represented "accountability."[80]

***Director Election Solicitation and Nominee "Integrity" Representations***

108.    Both Proxies solicit the re-election of the director nominees and represent that nominees "exhibit integrity, reliability, sound judgment," and the experience needed "to oversee the Company effectively."[81]  Here, the allegations are that these same directors breached their fiduciary duties.  Soliciting their re-election by means of governance and oversight representations that were false or misleading, and that omitted the recall, supplied the "essential link" causing re-election and perpetuating the alleged breaches.

---

[79] *See* 2025 Proxy at 46; 2026 Proxy at 49.

[80] *See* 2025 Proxy at 57.

[81] *See* 2025 Proxy at 10, 22; 2026 Proxy at 11, 25.

*Reaffirmation of the Growth Narrative in the 2026 Proxy*

109.    The 2026 Proxy's CEO letter and performance narrative tout "enduring growth," "another outstanding year," and the Company's long-range goal of "above-market revenue growth."[82]  These statements were misleading.  To the extent these statements re-affirmed the EP-driven growth story after the February 4, 2026, corrective disclosure (the Q4/FY2025 miss and EP deceleration) without curing the prior misstatements, they form part of the misleading-disclosure mosaic.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

110.    Plaintiffs bring this action derivatively and for the benefit of Boston Scientific to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

111.    Boston Scientific is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

112.    Plaintiffs are, and have been continuously at all relevant times, stockholders of Boston Scientific.  Plaintiffs will adequately and fairly represent the interests of Boston Scientific in enforcing and prosecuting its rights and have retained competent counsel experienced in derivative litigation to enforce and prosecute this action.

113.    Plaintiffs incorporate by reference and re-allege each allegation set forth above as if fully set forth herein.

114.    A pre-suit demand on the Board of Boston Scientific is futile and, therefore, excused.  At the time this action was commenced, the Board consisted of 10 directors: (i)

---

[82] *See* 2026 Proxy at i.

Defendant Mahoney; (ii) Defendant Habiger; (iii) Defendant Ludwig; (iv) Defendant Mega; (v) Defendant Morano; (vi) Defendant Pegus; (vii) Defendant Wichmann; and (viii) Defendant Zane (collectively, the "Director Defendants") as well as non-parties (ix) Smith and (x) Weber (together with the Director Defendants, the "Demand Board"). Plaintiffs need only allege demand futility as half of the directors who were on the Board at the time this action was commenced.

115. Demand is excused as to all of the Director Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the conduct alleged herein, which renders each of them unable to impartially investigate the charges and to decide whether to pursue an action against themselves and the other wrongdoers.

116. With respect to the U.S. EP misrepresentations, the Director Defendants either knowingly or recklessly participated in making, and/or causing the Company to make, the materially false and misleading statements alleged herein, and/or failed to correct those statements. As a result, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile and excused.

117. With respect to the ACCOLADE pacemaker battery oversight failure, the safety of the Company's implanted-device batteries was a mission-critical risk. Of the Company's 10 current directors, the eight Director Defendants who served during the multi-year period over which the internal battery-test failures accumulated and through the issuance of the December 2024 advisory consciously disregarded their duty to monitor a Board-level reporting system regarding that mission-critical risk, and failed to act in the face of years of red flags, including internal battery-test failures, the named pre-advisory patient death, and the December 2024 advisory. Eight of the 10 current directors served during the multi-year period over which the internal battery-test failures accumulated, and all 10 were on the Board at the time of the March

41

2026 recall correction. Those directors therefore face a substantial likelihood of liability for breaching their fiduciary duty, are not disinterested, and demand upon them is futile and excused.

118. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's major financial-risk exposures, the Company's system of internal controls, and the Company's compliance with applicable legal and regulatory requirements. The Audit Committee Defendants failed to discharge those responsibilities and allowed the Company to issue false and misleading statements and to disregard mission-critical product-safety risks. The Audit Committee Defendants therefore breached their fiduciary duties, are not disinterested, and demand is excused as to them.

119. The Individual Defendants' conduct described herein could not have been the product of legitimate business judgment, as it was based on bad faith and intentional, reckless, or disloyal misconduct. Accordingly, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter, and demand is excused as being futile.

120. The acts complained of herein constitute violations of the fiduciary duties owed by Boston Scientific's officers and directors, and these acts are incapable of ratification.

**DAMAGES TO BOSTON SCIENTIFIC**

121. As a result of the Individual Defendants' improprieties, Boston Scientific disseminated improper, public statements. These improper statements have devastated Boston Scientific's credibility as reflected by the Company's almost $24 billion, or 17.6%, market capitalization loss.

122. Further, Boston Scientific has been and will continue to be exposed to significant reputational and financial damages, including, but not limited to:

a)      product liability exposure arising from four deaths, 2,557 reported injuries, and the recall of more than 1.4 million ACCOLADE devices;

b)      the costs of remediation, including the development and deployment of a software mitigation, and of responding to FDA inquiries and communications;

c)      potential securities fraud liability and the costs of defending against any resulting litigation arising from the false and misleading statements concerning U.S. EP growth and fiscal 2025 guidance;

d)      the loss of credibility and goodwill with patients, physicians, regulators, and investors; and

e)      legal, accounting, and investigative costs associated with the foregoing.

### BREACHES OF DUTIES

123.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Boston Scientific, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

124.    The Individual Defendants breached their duties of loyalty and good faith by consciously failing to monitor or respond to red flags waved in the face of a supine Board—both with respect to the disclosure of material information concerning the sustainability of the Company's U.S. EP growth and fiscal 2025 guidance, and with respect to the mission-critical risk of the safety of the Company's implanted-device batteries.

125.    The Individual Defendants also breached their duties of loyalty and good faith by allowing the Company to make, or by themselves making, improper statements to the public and the Company's stockholders, and by failing to correct those statements.  These unlawful practices

wasted the Company's assets and caused Boston Scientific substantial damage.

126.    The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings.  The Audit Committee Defendants breached their duties of loyalty and good faith by approving the omission of material information, making or permitting the improper statements detailed herein, and failing to properly oversee the Company's public statements, risk exposures, and internal-control function.

## COUNT I

### Against the Individual Defendants
*(For Violations of Section 14(a) of the Exchange Act)*

127.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

128.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud.  Plaintiffs specifically disclaim any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

129.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9, prohibit the solicitation of proxies by means of a proxy statement that contains any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading.

130.    During the Relevant Period, the Individual Defendants caused the Company to file with the SEC proxy statements soliciting votes to, among other things, elect directors.  The Proxies represented that the Company's directors and officers were subject to, and that the Company

complied with, the Company's Code of Conduct and committee charters. The Proxies were materially false and misleading because, despite those assurances, the Company's Code of Conduct and committee charters were not complied with, in that the Individual Defendants made and/or caused the Company to make the false and misleading statements, and committed the oversight failures, discussed herein.

131.    In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the material facts alleged herein, the statements contained in the Proxies were materially false and misleading. The misrepresentations and omissions were material to Company stockholders in voting on the matters set forth for stockholder determination in the Proxies, including the election of directors. The false and misleading Proxies led to the re-election of the Director Defendants, allowing them to continue breaching their fiduciary duties. The Company was damaged as a result.

132.    Plaintiffs, on behalf of Boston Scientific, have no adequate remedy at law.

## COUNT II

**Against the Individual Defendants**
*(For Violations of Section 20(a) of the Exchange Act)*

133.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

134.    The Individual Defendants, by virtue of their positions with Boston Scientific and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Boston Scientific within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and officers and directors who made the false and misleading statements alleged herein. The Individual Defendants had, and exercised, the power and influence to cause the Company to engage in the conduct complained of herein.

45

135.    Plaintiffs, on behalf of Boston Scientific, have no adequate remedy at law.

## COUNT III

### Against the Individual Defendants
### *(For Breach of Fiduciary Duty)*

136.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

137.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Boston Scientific's business and affairs.

138.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

139.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly made, and/or caused the Company to make, materially false and misleading statements during the Relevant Period, and/or failed to disclose, that: (i) the U.S. EP segment was subject to material adverse trends affecting procedure volumes; (ii) the U.S. EP segment faced intensifying competitive pressures; (iii) the U.S. EP segment faced regulatory and reimbursement headwinds; (iv) the U.S. EP segment's growth rate was unsustainable and the segment was approaching a tipping point earlier than the market anticipated; and (v) as a result of the foregoing, the Company's positive statements concerning fiscal 2025 growth and its elevated full-year guidance lacked a reasonable basis.

140.    In further breach of their fiduciary duties of loyalty and good faith the Individual Defendants consciously failed to monitor or respond to red flags raised by the Board-level system for overseeing the mission-critical risk of the safety of the Company's implanted-device batteries, despite years of internal battery-test failures, prior recalls on the same and adjacent pacemaker

46

product lines, named pre-advisory patient deaths, and the December 2024 advisory—an oversight failure that resulted in patient deaths, thousands of injuries, and a 1.4-million-device Class I recall.

141.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls, and internal controls, and failed to correct, and/or caused the Company to fail to correct, the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company.

142.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Boston Scientific has sustained and continues to sustain significant damages, and the Individual Defendants are liable to the Company.

143.    Plaintiffs, on behalf of Boston Scientific, have no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants
### *(For Unjust Enrichment)*

144.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

145.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Boston Scientific.

146.    The Individual Defendants either benefited financially from the improper conduct, or received bonuses, stock options, or similar compensation from Boston Scientific that was tied to the performance or artificially inflated valuation of Boston Scientific, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

47

147.    Plaintiffs, as stockholders and representatives of Boston Scientific, seek restitution from the Individual Defendants, and seek an order from this Court disgorging all profits, benefits, and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

148.    Plaintiffs, on behalf of Boston Scientific, have no adequate remedy at law.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiffs may maintain this action on behalf of Boston Scientific, and that Plaintiffs are adequate representatives of the Company;

B.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Boston Scientific;

C.    Determining and awarding to Boston Scientific the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.    Directing Boston Scientific and the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, strengthening the Board's oversight of product safety and of the Company's public disclosures, and developing and implementing procedures to ensure the timely escalation to the Board of mission-critical product-safety risks;

E.    Awarding Boston Scientific restitution from the Individual Defendants;

48

F.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: July __, 2026                          Respectfully submitted,

                                              HUTCHINGS BARSAMIAN
                                               MANDELCORN, LLP


                                              */s/Theodore M. Hess-Mahan*
                                              THEODORE M. HESS-MAHAN
                                              BBO #557109
                                              110 Cedar Street, Suite 250
                                              Wellesley Hills, MA 02481
                                              Telephone: (781) 431-2231
                                              Facsimile: (781) 431-8726
                                              E-mail: thess-mahan@hutchingsbarsamian.com

                                              ROBBINS LLP
                                              Brian J.  Robbins (*pro hac vice* forthcoming)
                                              Kevin A.  Seely (*pro hac vice* forthcoming)
                                              Grant M.  Klasna (*pro hac vice* forthcoming)
                                              5060 Shoreham Place, Suite 300
                                              San Diego, CA 92122
                                              Telephone: (619) 525-3990
                                              Facsimile: (619) 525-3991
                                              E-mail: brobbins@robbinsllp.com
                                                      kseely@robbinsllp.com
                                                      gklasna@robbinsllp.com

                                              *Counsel for Plaintiffs*


1735275

49